FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JUN -1 AM 9:42

U.S. DISTRICT COURT
N.D. OF ALABAMA

DAVID SPRAGGINS, et al.,          )
                                  )
          Plaintiffs,             )
                                  )     CV-97-P-1375-S
-vs.-                             )
                                  )
SAMFORD UNIVERSITY,               )
                                  )
          Defendant.              )

ENTERED

JUN 0 2 1999

## MEMORANDUM OPINION

The defendant's summary judgment motion, filed August 31, 1998, was taken under submission after a hearing in chambers on November 24, 1998. Based on the briefs, evidence, and oral argument presented, the court finds that the defendant's motion is due to be granted in part and denied in part. The court finds that Samford's summary judgment motion is due to be denied as to the plaintiffs' claims for disparate treatment in working conditions but granted as to all other claims.

### Facts

This multi-plaintiff[1] case was filed on June 4, 1997.[2] The eight plaintiffs, all black housekeeping employees in the Facilities Services Department at Samford University, allege that they

---

[1]The complaint initially listed ten plaintiffs, including: David Spraggins, Joick Goodwin, Marvin Williams, Lee Anderson, Anthony Bogus, Lillie Patterson, Anne Kelley, Theo Sparks, Ava Strong, and Diane Jackson. However, all claims by Anne Kelly and Theo Sparks were dismissed with prejudice for failure to respond to interrogatories on January 16, 1998. Eight plaintiffs remained after the January 16, 1998 order.

[2]The plaintiffs filed multiple amendments to their complaint, the last of which is dated October 28, 1997.

1

37

were racially harassed in the workplace and were treated differently because of their race with regard to working conditions and pay. The plaintiffs initially sued Samford University and UNICCO Maintenance Services[3] for claims under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1985, and 29 U.S.C. § 1001 (ERISA).[4]  Samford University filed its summary judgment motion on August 10, 1998.

Samford University is a private Christian institution of higher-education. Until 1996, Samford's custodial and building repair services were provided by Samford employees in the Facilities Services Department. The Facilities Services Department was divided into two separate divisions: the housekeeping department and the maintenance department. Employees in the housekeeping department were charged with such responsibilities as dusting, mopping and cleaning bathrooms.[5] Maintenance department employees, on the other hand, performed such tasks as painting, rewiring, and repairing. In 1996, when Laverne Farmer, Vice President for Business Affairs, became aware of campus complaints of dissatisfaction with the service provided by the Facilities Services Department, he hired a consulting firm to evaluate the situation and recommend a course of action. The consulting firm suggested contracting out the housekeeping and professional services to an

---

[3]UNICCO was voluntarily dismissed without prejudice by the plaintiffs on March 19, 1998. The plaintiffs failed to file EEOC charges against UNICCO, the entity that Samford contracted with in 1996 to provide housekeeping and maintenance work. The former Samford employees were given the opportunity to become employees of UNICCO after they were terminated by Samford.

[4]The plaintiffs include claims for: (1) racially motivated discharge, (2) race discrimination in promotion as to plaintiffs Goodwin and Spraggins, (3) racial harassment (hostile working conditions), (4) disparate treatment in working conditions and pay, (5) disparate impact, (6) constructive discharge, (7) conspiracy, and (8) ERISA violations.

[5]At the time of the events giving rise to this lawsuit, 49 out of 50 housekeeping employees were black. All of the maintenance employees were white.

2

outside company. Samford accepted bids for the contract[6] and eventually chose UNICCO.

In July 1996, Farmer sent a memo to all housekeeping and maintenance employees advising them of the impending contract with UNICCO.[7] The memo informed the employees that under the contract they would be able to work for UNICCO for at least 66 days at their present rate of pay but that as of July 26, 1997 they would no longer be employed by Samford.[8] Apparently, most the former Samford employees accepted jobs with UNICCO.[9]

According to the plaintiffs, UNICCO reduced the housekeeping employees' wages to $6.00 per hour without regard to length of prior employment with Samford, while the maintenance employees' wages remained the same.[10] The plaintiffs allege that some of the white employees began calling some of the black housekeeping personnel "six dollar niggers" as a result of the wage reduction. Further, the plaintiffs assert that they complained to upper management about the

---

[6]The request for proposal specifically required that the contractor employ the former Samford housekeeping and maintenance employees for 66 working days at the present level of compensation unless terminated for a policy violation or unless the employee voluntarily resigned. The request for proposal also specified minimum benefits that the bidding contractors must provide to the former Samford employees.

[7]The plaintiffs assert that Farmer knew at the time the contract was entered into that only the housekeeping employees would have their wages reduced. Because 49 out of the 50 housekeeping employees were black while all of the maintenance employees were white, the plaintiffs assert that the reduction in wages impacted them unfairly.

[8]Throughout their pleadings and briefs, the parties refer to June 27, 1996, July 24, 1996, July 26, 1996, July 27, 1996 and July 27, 1997 as the termination date of the plaintiffs' employment with Samford. The court assumes that the July 26, 1996 date is correct.

[9]Patterson and Spraggins did not accept employment with UNICCO. Bogus, Goodwin, Williams and Anderson worked for UNICCO for only a matter of days. Strong and Jackson worked for UNICCO for approximately one year.

[10]The pre-termination salaries of the housekeeping employees at Samford ranged from $6.55 per hour to $9.64 per hour.

3

comments but that nothing was done.

The plaintiffs also assert a wide array of claims regarding allegedly racially hostile treatment at Samford. Specifically, the plaintiffs claim that they were not allowed to use the same facilities as the white employees until 1996, were forced to "clock-in" in a 4' x 8' foot room made of chicken wire while white employees were allowed to clock-in at a clean and well-kept building, were paid differently according to their race, and were otherwise racially harassed.[11] On three occasions, several of the plaintiffs found a black doll hanging by its neck in the shop area of the physical plant building.[12]

Six of the plaintiffs filed EEOC claims against Samford regarding the allegedly discriminatory treatment. Although the other four plaintiffs did not file EEOC claims at all, their Title VII claims "piggyback" under the identical claims of the other plaintiffs. See Jones v. Firestone Tire & Rubber Co., Inc., 977 F.2d 527, 531 (11th Cir. 1992).

## Analysis

### I. Race-based Discharge

Samford moves for summary judgment on the plaintiffs discharge claims, arguing that the plaintiffs were not discharged because of their race. Samford asserts that all Facilities Services Department employees, including both black and white persons, were terminated when Samford contracted with UNICCO to provide custodial and repair services. The plaintiffs, however, argue

---

[11] According to their affidavits, the plaintiffs were not given uniforms or provided a "break room" like the maintenance employees were. Further, they assert that they were forced to eat in closets or bathrooms and were not provided with on-campus housing or employer-provided transportation.

[12] The three incidents occurred withing a two year period from 1995 to 1996 and were reported to management.

4

that Samford is not entitled to summary judgment on the race-based discharge claim under the theory

that Samford terminated the plaintiffs by entering into the contract with UNICCO even though

Samford knew prior to the plaintiffs' termination date that the plaintiffs would be rehired by UNICCO

for less wages. According to the plaintiffs, Samford fired the black housekeeping employees only to

have them "replaced by other black persons, who were willing to accept a lower rate of pay than the

plaintiffs." Curiously, however, the plaintiffs also assert a claim for constructive discharge (see part

VII of this opinion) against Samford.

The plaintiffs' race-based discharge claim must fail for several reasons. First, the plaintiffs

have not proved their prima facie case of discrimination. In order to present a prima facie case, a

plaintiff must show that: (1) he was a member of a protected group, (2) he was qualified for the

position held, (3) he was laid off, fired or demoted, and (4) the employer retained in the plaintiff's

position a person outside the protected class. See Coutu v. Martin County Bd. of County Comm'rs,

47 F.3d 1068, 1073 (11th Cir. 1995). Here, although the plaintiffs are members of a protected group,

were apparently qualified for the positions, and were fired as a result of the UNICCO contract, they

have failed to show that Samford retained individuals outside the protected class in their positions.[13]

In fact, as of July 26, 1996, Samford retained *no* employees of any kind in the housekeeping and

maintenance departments. Instead, UNICCO, an independent contractor, hired the housekeeping and

maintenance employees.[14] Although the plaintiffs argue that UNICCO became an agent of Samford

---

[13]Even under the more relaxed prima facie case for reduction in workforce claims, the plaintiffs have not shown that they were qualified for other positions available at Samford at the time of their termination or that Samford discriminated against them by failing to consider the plaintiffs for other positions.

[14]The plaintiffs argue that Samford retained sufficient control over UNICCO to establish agency liability for the alleged discrimination. The plaintiffs cite to Samford's contract with

when it took over the employment of the custodial workers, the court finds no substantial evidence in this case to support any claim that Samford and UNICCO operated as an "intergrated enterprise," "joint employer," "single employer," or as agents for each other.    Samford is not liable for any alleged discriminatory termination or for any actions of UNICCO after the date of the plaintiffs' termination from employment at Samford. The summary judgment motion is due to be granted as to this claim.

## II. Promotion as to Plaintiffs Goodwin and Spraggins

Plaintiff Joick Goodwin alleges that he was denied promotions at Samford because of his race. In order to present a prima facie case of discrimination in promotion, a plaintiff must show that: (1) he is a member of a protected class, (2) he was qualified for and applied for the promotion, (3) he was rejected, and (4) the employer either continued to seek applicants for the position or filled the position with a person outside the plaintiff's protected class.  See Walker v. Mortham, 158 F.3d 1777 (11th Cir. 1998).[15]  Goodwin asserts that he was denied two promotions at Samford: a computer lab job and a security guard position. However, Goodwin has failed to satisfy his prima facie case for several reasons.  First, as to the computer job, he is unable to identify the particular position for which he

---

UNICCO which provided, among other things, (1) the right to approve or disapprove direct labor cost, (2) the right to review resumés of supervisory and management personnel hired by UNICCO to work on the Samford campus, (3) the right to review individual work assignments, and (4) the right to insist that UNICCO's employees abide by Samford's policies.

[15]Both parties cite to case law which requires the plaintiff to show that other equally or less qualified employees who were outside the protected class were promoted as the fourth element of the prima facie case. The Eleventh Circuit, however, has held that plaintiffs do not have to satisfy the "equal or lesser qualified" standard as part of the prima facie case.  Instead, the plaintiff must show only that the employer hired someone outside the protected class or continued to seek applicants. See Walker, 158 F.3d 1777 (11th Cir. 1998).

applied. Second, he has not shown that he was even minimally qualified for the position. Finally, he has not shown that the person hired was outside his protected class. As for the security guard position, Goodwin is unable to satisfy the fourth prong of his prima facie case because the person hired for the position was black. Samford is entitled to summary judgment as to Goodwin's failure to promote claims.

Spraggins's failure to promote claim is also due to be dismissed, although for different reasons. Spraggins apparently applied for a position as a security guard at Samford in January 1992. However, Spraggins did not file his EEOC charge until September 17, 1996. Aside from the fact that Spraggins did not mention the failure to promote claim in his EEOC charge, the promotion claim is time-barred under both Title VII and § 1981. Further, Spraggins did not re-apply for a security guard position at any time after January 1992. Samford's motion for summary judgment is due to be granted as to all failure to promote claims.

III. Racial Harassment (Hostile Working Environment)

In order for a plaintiff to state an actionable claim for hostile working environment based on race, he must show that: (1) he is a member of a protected group, (2) he was subjected to racial harassment, (3) the harassment occurred because of his race, (4) the harassment affected the terms, conditions, or privileges of her employment, and (5) the employer is liable for the harassment. See Merriweather v. Alabama Dept. of Public Safety, 17 F. Supp. 1260, 1271 (M.D. Ala. 1998). The severity and pervasiveness of the conduct is important in the "totality of the circumstances" analysis in hostile environment claims. See Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1989). Because the hostile environment claims by each of the plaintiffs in this case are necessarily fact-sensitive, the court must address each plaintiff's claim individually.

7

### A. Ada Strong

Strong's affidavit states that she was "met with hostility" by white employees when she and others attempted to use the "white employees" breakroom on campus. According to Strong, the white employees would "fun" the black workers, "talk down" to them, and ignore them. Strong also notes that she complained several times to her supervisor, Willie Harvel, about the "racial slurs and racial hostility" but nothing was ever done. Strong's deposition, however, shows that she was never actually subjected to racial harassment, but rather, heard of harassment from others. She testifies to overhearing students talking about Samford as a racial campus and heard about a black doll hanging in the physical plant. Furthermore, with regard to a campus meeting on racial harassment, Strong comments that "I really didn't think nothing, because it really didn't bother me." Although Strong is a member of a protected group, she is unable to satisfy the other elements of a hostile environment charge. Clearly, Strong's complaints are not severe or pervasive enough to rise to the level of a hostile environment claim. Strong was not personally subjected to racial slurs, epithets, or conduct that would rise to the level of an actionable harassment claim. Strong's claim for hostile working environment is due to be dismissed.

### B. Diane Jackson

As with Strong, Jackson states in her affidavit that she complained on several occasions to her supervisor about racial slurs and hostility but nothing was done. However, in her deposition, Jackson testifies that no racial slurs or comments were ever made to her directly or to someone else in her presence. Instead, Jackson acknowledges that she was told by fellow co-workers about their experienced harassment. Jackson's main complaint against Samford centers on the pay cut she experienced when UNICCO hired the housekeeping and maintenance employees. No reasonable jury

could find in favor of Jackson on a racial harassment theory because the evidence simply does not rise to the level of an actionable claim. Samford is entitled to summary judgment on Jackson's hostile environment claim.

### C. Lillie Patterson

Patterson, who declined employment with UNICCO after termination by Samford, also claims that she complained to her supervisor about "racial slurs . . . and racial hositility." However, her deposition shows that she was never personally harassed. In fact, the only time she ever heard any type of racial comment was on one occasion when a white co-worker called a black co-worker "boy." Patterson heard about some other instances of alleged racial harassment from fellow housekeeping employees but was never the target of any race-related comment. Patterson claims to have heard about the doll-hanging incident but did not see it herself. As with Strong and Jackson's claims, Patterson simply cannot prove a prima facie case of hostile work environment. The court finds that summary judgment is due to be granted as to this claim.

### D. Joick Goodwin

Although Goodwin asserts in his affidavit that he was "called a six-dollar nigger" by two white employees in the maintenance department, Goodwin's deposition testimony reveals that he never actually heard anyone say this phrase or use the word "nigger" in his presence. Apparently, a co-worker told Goodwin that he heard the racial slur used. Goodwin does have personal knowledge of an incident that occurred after a meeting with UNICCO representatives in which two maintenance department painters ("Skip and Keith") made comments to him such as "since your pay have been cut . . . [h]ow are you going to feed your family," "Do you need to wear some of my underwear,"

9

and "Do you need me to come over your house and take care of your wife?" However, after hearing

the comments by Skip and Keith, Goodwin testified that he "laughed and kept walking . . [b]ecause

I didn't take it serious." The only other occasion that Goodwin claims to have heard a racial

comment occurred outside the physical plant building. According to Goodwin, he heard Skip and

Keith say "Look at all those blacks in the clock-out." Apparently the two painters made obnoxious,

playful comments - not just racial comments - on occasion.

Goodwin also fails to prove his prima facie case of harassment. The conduct Goodwin

complains of is simply not severe or pervasive enough to rise to the level of an actionable hostile

work environment claim. Even Goodwin himself notes in regard to one of the incidents, "I didn't

take it serious." Samford is entitled to have this claim dismissed.

### E. Anthony Bogus

The first incident of which Bogus complains apparently occurred in the summer of 1995, when

he and co-worker Marvin Williams found a black doll hanging from an iron beam in the lower shop

area of the physical plant building. Bogus did not report this incident to anyone because he believed

that Williams was going to talk to their supervisor. However, Bogus has no idea if Williams ever

actually reported the incident and has not discussed the matter with Williams since its occurrence.

In the spring of 1996, Bogus and co-worker Lenora Brown once again stumbled upon a hanging

black doll in the weight room of one of the campus buildings. This time, Bogus says that he and

Brown reported the incident to their supervisor, Willie Harvel. Bogus also complains about that he

and other black workers were constantly being called "boys" by certain white maintenance personnel.

According to Bogus, he and others in the housekeeping department told their supervisor about the

harassment on numerous occasions. Bogus says he even informed Mark Fuller, Director of Facility

Management, about the incident in which Skip and Keith called Bogus and two other black workers "six-dollar niggers" and made other derogatory, sexual comments. Finally, Bogus states in his affidavit that he saw a drawing of a black person being hung with "KKK" written on the picture. In his deposition testimony, however, Bogus denies any personal knowledge of this incident, stating that he only heard "hearsay" about it from a co-worker.

Under a totality of the circumstances analysis, the court looks to both the severity as well as the number of incidents of harassment. Although there is no mechanical or absolute numerical standard governing this court's determination, recent case law provides much guidance as to whether conduct is sufficiently severe or pervasive to constitute actionable racial harassment. See Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75 (1998)( it is well-settled that simple teasing, offhand comments and isolated incidents (not extremely serious) do not affect terms and conditions of employment); Vance, 863 F.2d at 1510-1511(law requires that the court look at both the frequency and gravity of the incidents); EEOC v. Beverage Canners, 897 F.2d 1067, 1070 (11th Cir. 1990) (finding that where racial remarks were so "commonplace, overt and denigrating" that they created a hostile work environment); Triplett v. Electronic Data Sys., 710 F. Supp. 667, 672 (W.D. Mich.1989), aff'd, 900 F. 2d 260 (6th Cir. 1990) (discourteousness and tension in the workplace were not related to racial differences where complaints included lack of eye contact and shortness in conversation).

In this case, Bogus has not presented a prima facie case of harassment. However, even assuming that Bogus has shown that the conduct was so severe or pervasive that it affected the terms or conditions of his employment, Samford has responded with an affirmative defense as established in Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2292 (1998). Under the Faragher holding, a

11

defendant can assert an affirmative defense to liability and damages in a discrimination case by showing: "(a) the employer excercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 2293. Here, Bogus states that he reported most of the incidents to his supervisor, Willie Harvel, and on one occasion reported an incident to Mark Fuller, a high level manager. After recieving Bogus's report concerning the racial statements on July 24, 1996, Fuller met with Skip and Keith the next day to tell them about the charges and inform them that the warning would serve as the first step in the disciplinary process. The evidence shows that Skip and Keith stopped the teasing and taunting after this meeting.[16] After the doll hanging incidents, Samford's president also held a campus-wide meeting to address the issue of racial harassment on the campus and re-affirm that any form of harassment would not be tolerated at Samford. Although Samford's harassment policy states that an employee may report incidents of harassment to any member of upper management, Bogus and others reported only one specific instance to Fuller on only one occasion. Although Bogus claims to have told his immediate supervisor, Harvel, of harassment on several occasions, he did not take advantage of reporting the conduct to other higher managers when his problems were not corrected to his satisfaction. Because Samford acted reasonably in correcting and preventing the harassment and Bogus did not take reasonable advantage of the harassment policy, the court finds that summary judgment is due to be granted in favor of the defendant.

### F. David Spraggins

---

[16]Fuller testifies that other than the July 24, 1996 report, he did not receive any other reports concerning racial harassment or inappropriate behavior toward black employees in the housekeeping department.

12

According to Spraggins, "Working at Samford, you hear racial slurs all the time." However, except for one specific instance in which Spraggins recalls being called "boy" by white maintenance workers, the only other racial comments he describes were made by students.[17]  Spraggins did not see the doll hanging or the drawing but says that he heard about the incidents. Because Spraggins's evidence does not show that the conduct was severe or pervasive, the court finds that Samford's motion is due to be granted as to his claim.

### G. Marvin Williams

In addition to normal custodial duties, Williams also drove the supply truck for the housekeeping department. According to Williams, white maintenance employees called him "boy," talked about "his mama," and used the word "nigger" in his presence. In Williams's opinion, all of these statements were racially motivated and occurred on numerous occasions.[18]  Williams also saw the first black hanging doll and was present when the black temporary campus employee (not a housekeeping employee) found the hanging drawing. Williams apparently reported all of these incidents to his supervisor, Harvel. Williams was also a participant in the incident involving Skip and Keith in which the term "six dollar nigger" was used, although Williams did not hear the comments.[19]

The defendant's motion is due to be granted for the same reasons as for Spraggins's hostile environment claim. Even assuming Williams's evidence is severe and pervasive enough to constitute

---

[17]Clearly, Samford is not liable for isolated and sporadic comments made by its students.

[18]On one occasion, Williams says that a maintenance supervisor was present during a conversation in which racial slurs were used. Although the supervisor did not make any of the comments, Williams testifies that the supervisor laughed at the comments. Apparently, Williams did not complain about this incident.

[19]Williams also states in his deposition that Skip and Keith "bad mouthed" white managers, supervisors, and administrators as well.

actionable harassment, Samford has proffered a valid Faragher defense to his claim. Samford is entitled to summary judgment on this count.

### H. Lee Anderson

In his deposition, Anderson testifies that he and Goodwin saw the black doll hanging in the gymnasium and that he is unsure whether he reported the incident to his supervisor. Anderson also states that Skip and Keith "would always joke and say stuff" to him and that he responded to their comments by saying the same thing back to them. Anderson thinks he told his supervisor about Skip and Keith's taunting but is not sure. Anderson did not report the conduct to anyone else. Although Anderson claims to have heard about the hanging picture, he did not see the picture. The court finds that the doll hanging incident was an isolated incident that, although unfortunate, does not rise to the level of an actionable discrimination claim. Further, by Anderson's own description of Skip and Keith's comments as "jokes, " it is difficult for this court to find that the atmosphere was so racially charged that it substantially affected the terms and conditions of his employment. Therefore, the court finds that the summary judgment motion is due to be granted on this claim.

### IV. Disparate Treatment in Working Conditions

As noted by the Supreme Court in Teamsters v. United States,

> Disparate treatment . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

431 U.S. 324, 335 n.15 (1977) (citations omitted). Although a plaintiff may claim unfair treatment, that alone will not suffice to prove disparate treatment without proof of intentional discrimination.

14

In the present case, the plaintiffs claim disparate treatment in their working conditions at Samford. Specifically, the plaintiffs cite to four categories of alleged discriminatory treatment: (1) campus housing and transportation, (2) breakroom/lunch facilities, (3) clock-in/clock-out facilities, and (4) uniforms. As to the complaint that Samford did not provide on-campus housing for the black housekeeping employees as was done for some of the maintenance employees, the plaintiffs have not shown that any *white housekeeping* employees were treated differently. Instead, Samford has presented evidence that only maintenance employees were provided on-campus housing out of business necessity. While it was important to have an "on-call" maintenance person to fix emergency plumbing or electrical problems, the plaintiffs have not shown that there was a need for housekeepers to live on campus.[20] The plaintiffs have also shown no discriminatory intent on behalf of Samford in providing the on-campus housing for some of the maintenance employees. The plaintiffs, therefore, cannot claim disparate treatment with regard to campus housing.

Similarly, the plaintiffs are unable to show any disparate treatment regarding employer-provided vehicles. The plaintiffs cannot show that similarly situated white persons were provided on-campus transportation. Instead, the plaintiffs argue that the maintenance employees, all of whom were white,[21] were provided with vehicles. The plaintiffs have not shown any evidence of discriminatory intent with regard to either the on-campus housing or vehicles. Summary judgment is due to be granted to Samford as to these two claims.

---

[20]Although several of the plaintiffs claim to have been "on call" and had beepers, there is no evidence that they performed the same functions as the maintenance employees so that on-campus housing would be necessary.

[21]According to plaintiff Spraggins's deposition, there was at least one black employee in the maintenance department at some point relevant to this litigation. None of the plaintiffs ever applied for transfer to the maintenance department.

The plaintiffs assert, as a second "working conditions" complaint, that they were required to eat their lunch in closets or in restrooms rather than in areas used by other white employees. According to the plaintiffs, they were "ordered" by their supervisors to eat in closets or the rooms next to restrooms due to complaints about the housekeepers eating in the building lounges.[22] Although Samford asserts that any employee can eat lunch in the common areas, including the cafeteria or outside on campus grounds, and "vehemently" denies that the plaintiffs were ever told that they must eat lunch in such areas, there is disputed evidence which creates a genuine issue of material fact. The plaintiffs also complain that they were denied access to the employee breakroom until 1996 when Samford let the housekeeping employees use the existing breakroom and clock-in area used by the white employees.[23] Once again, the evidence concerning these allegations is in dispute. As a result, the court finds that the summary judgment motion is due to be denied as to the working condition claims regarding the use of the breakroom and the areas in which the black employees could eat lunch.

The plaintiffs also complain about the clock-in/clock-out areas that they were required to use. According to the evidence presented by the plaintiffs, the clock-in area to which the plaintiffs were assigned was a very small part of the shop area in which cleaning supplies were kept. The clock-in area apparently was made of chicken-wire and was not as clean and dry as the clock-in area used by the white employees. In 1996, however, the plaintiffs allege that Samford "finally let us use the . .

---

[22]According to the plaintiffs, supervisor Willie Harvel, who is also black, and supervisor Dot Rencher, told the black housekeeping employees that they could not use the break room or the lounge because it was "for the white people."

[23]According to the plaintiffs' affidavits, they complained to management on numerous occasions about the disparate treatment.

. clock-in area."  The court finds that there are genuine issues of material fact which preclude an entry of summary judgment.  Samford's motion is denied as to the working conditions claims regarding the clock-in areas.

Finally, the plaintiffs allege that they were treated unfairly in that they were not provided with uniforms while the white maintenance employees were given uniforms.  Although Samford provided uniforms for the housekeeping employees in the spring of 1995, the employees in the maintenance department received the uniforms approximately one year earlier.  Even assuming that the plaintiffs presented a prima facie case of disparate treatment, Samford has articulated a legitimate, non-discriminatory reason for its actions.  Samford has shown that the delay in getting uniforms for the housekeeping employees was due to a conflict with the uniform supplier and that the uniforms were in fact provided, albeit after the maintenance employees received their uniforms.  Because the plaintiffs have not shown that Samford's reason was pretexts for discrimination, the court finds that summary judgment is due to be granted as to the claim for disparate treatment with regard to supplying uniforms.

## V. Disparate Treatment in Pay

A plaintiff asserting a claim for discriminatory compensation must show that he was paid less than a member of a different race who performed substantially the same work duties and responsibilities.  See Barber v. International Brotherhood of Boilermakers, 778 F.2d 750 (11th Cir. 1985).  Here, the plaintiffs assert that although their housekeeping duties were substantially similar to those of the maintenance workers, the plaintiffs were paid less.  There are several flaws in the plaintiffs' analysis, however.  First, and foremost, the evidence clearly shows that the two

departments (housekeeping and maintenance) had different job descriptions and performed different job duties. While the housekeeping employees were charged with such tasks as emptying trash, dusting, mopping, vacuuming, and waxing floors, the maintenance workers performed the work of plumbers, electricians, mechanics and painters. Additionally, even assuming the two departments did perform the same work, any claim for unequal pay would lie against UNICCO rather than Samford. Finally, the reduction in pay affected all housekeeping personnel, both black and white. The plaintiffs' complaints regarding pay relate only to the fact that their longevity raises were taken away when UNICCO took over as their employer while the maintenance employees' raises were not.[24] There is simply no basis for an actionable discriminatory compensation claim by the plaintiffs. Samford is entitled to summary judgment on the disparate treatment in pay claim.

## VI. Disparate Impact

A plaintiff asserting a claim of disparate impact must show that an employer's facially neutral practice or policy has a discriminatory impact on a particular group and that the practice or policy cannot be justified by a business necessity. See Edwards v.Wallace Community College, 49 F.3d 1517, 1520 (11th Cir. 1995). The plaintiff, however, must also show as part of the prima facie case that the disproportionate impact affected them differently than *similarly situated employees* outside the protected class. See Mitchell v. Jefferson County Bd. of Ed., 936 F.2d 539 (11th Cir. 1991).

Here, the plaintiffs assert a claim of disparate impact against Samford under the theory that "a race neutral policy or procedure on its face, as stated in the complaint, had a disparate impact against the plaintiffs, who are all African-Americans." (See Complaint, as amended, ¶ 13). The

---

[24]The fact that Samford paid UNICCO on a cost-plus basis does not change the court's holding.

18

plaintiffs do not, however, specify exactly what policy or procedure allegedly caused the disparate impact. In their response brief, the plaintiffs state:

> In this case, all of the black employees had their wages lowered and all of the white persons did not. The school said that they did it because of a business necessity, but plaintiff's exhibit [sic] shows that these plaintiffs were not receiving more than the standard wage rate for the community. Not any more than the white employees.

(See Plaintiff's Brief, ¶ I). This claim is not actionable against Samford, however, because UNICCO was the entity responsible for setting wages as of July 26, 1996. Because the plaintiffs' disparate impact claims apparently center only on UNICCO's decision to lower wages for the housekeeping employees, Samford should not be liable. The defendant's motion for summary judgment is due to be dismissed as to this claim.

## VII. Constructive Discharge

A constructive discharge claim lies where a plaintiff resigns as a result of objectively intolerable conditions in the workplace. As such, the plaintiff must not only have resigned, but must also  prove that his working conditions were so unpleasant that a reasonable person in the same situation would have also felt compelled to resign. See Wilson v. S & L Acquisition Co., 940 F.2d 1429, 1436 (11th Cir. 1991).    In their complaint, the plaintiffs state that they were constructively discharged due to the "racist work conditions and terms of employment." However, the plaintiffs fail to state an actionable claim for constructive discharge against Samford because Samford actually *fired* the plaintiffs. To the extent that the plaintiffs intended to assert the constructive discharge claims against UNICCO, such a claim is clearly not supported by the record, despite the fact that UNICCO has been dismissed as a defendant in this case. Samford is entitled to summary judgment as to the

19

constructive discharge claim.

## VIII. Conspiracy to Intentionally Discriminate

In their final amended complaint, the plaintiffs assert a conspiracy claim against Samford. The plaintiffs' complaint states that Samford and UNICCO conspired to

> intentionally discriminate against the plaintiffs as related to the termination of the plaintiffs by defendant Samford, the contract between Samford and UNICCO, and the subsequent reduction of the pay, promotional loss, and benefit loss of all the plaintiffs, both by disparate treatment and under the disparate impact theory, under Title VII and Section 1985.

(Complaint, as amended, ¶ 14). This claim is due to be dismissed as the parties have agreed that there is no evidence of a conspiracy between Samford and UNICCO to deny the plaintiffs of their civil rights.

## IX. ERISA

The plaintiffs' complaint, as amended, also includes an ERISA claim against Samford. The plaintiffs assert that they were discharged by Samford "in an effort to cut the ERISA protected benefits of the black employees in the housekeeping department." However, the plaintiffs' attorney candidly admitted that there was no basis for this claim during the November 24, 1998 hearing in chambers and the court agrees. Therefore, the ERISA claim is due to be dismissed.

## Conclusion

This case shall proceed to trial on the basis of the disparate treatment in working conditions claim. All other claims have been dismissed.

Date: _____ May 29 _____, 1999.

_____
Chief Judge Sam C. Pointer, Jr.

Service List:
    Jeffrey W. Bennitt
    Robyn G. Bufford
    Peyton Lacy, Jr.
    James C. Pennington
    Lisa C. Cross

21